**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 22-cr-15 (APM) |
| | : | |
| v. | : | |
| | : | |
| ROBERTO MINUTA, | : | |
| | : | |
| JOSEPH HACKETT, | : | |
| | : | |
| DAVID MOERSCHEL, and | : | |
| | : | |
| EDWARD VALLEJO, | : | |
| | : | |
| Defendants. | : | |

## UNITED STATES' OMNIBUS OPPOSITON TO DEFENDANTS' MOTIONS IN LIMINE

Defendants Roberto Minuta and Joseph Hackett raise a number of arguments in their motions *in limine* regarding facets of the government's case, ranging from opening statements to exhibits to the mode of examining witnesses.   The Court has already addressed and rejected many of these arguments, and the others should meet the same fate.

Roberto Minuta, Joseph Hackett, David Moerschel, and Edward Vallejo have been charged by indictment for their participation in a plot to use force to oppose the authority of the Government of the United States and to prevent, hinder, or delay the execution of specific laws and provisions of the Constitution of the United States governing the transfer of presidential power.   The indictment charges all defendants with seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Three); and conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four).   ECF No. 167.   Some

defendants were additionally charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2; and tampering with documents or other objects and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(1) and 2. *Id.*[1]

On May 12, 2021, this Court scheduled two trial dates of September 26, 2021 (the "first trial"), and November 29, 2021 (this trial, now scheduled for December 5, 2022). ECF No. 133. Defendants Roberto Minuta and Joseph Hackett now file a number of pretrial motions *in limine*. Each should be denied.

1. *Previous Motions*

Hackett joins the following motions that have previously been filed by other co-defendants:

a. ECF No. 216, Jessica Watkins's Opposition to Government's Motion *in Limine* Pursuant to Rule 404(b) regarding Jeremy Brown's explosives and Watkins's possession of bomb-making instructions. The government hereby incorporates its arguments in opposition to Watkins's motion on August 12, 2022, ECF No. 251. The Court has previously ruled the government may present evidence of Jeremy Brown's explosives but not Watkins's bomb-making instructions. *See* 08/30/22 Tr.

b. ECF No. 217, Thomas Caldwell's Opposition to the Introduction of Certain Trial Evidence. Specifically, Hackett joins Caldwell's motions to preclude Caldwell's "death list," attempted purchase of a .380 caliber handgun, and attempt to have another individual build him firearms; any evidence involving Rhodes's firearms and ammunition after January 6, 2021; Jeremy Brown's explosives and firearms; and

[1] The government hereby incorporates its factual recitations of the evidence in this case included in its Rule 404(b) Notice filed on July 8, 2022, ECF No. 187 at 1-8, and its Rule 29 opposition filed on November 3, 2022, ECF No. 383 at 1-34.

2

Watkins's bomb-making instructions.    The government hereby incorporates its arguments in opposition to Caldwell's motion on August 12, 2022, ECF No. 251.    The Court has previously ruled that the government may present evidence of Caldwell's attempted purchase of a .380 caliber handgun and attempt to have another individual build him firearms; evidence involving Rhodes's firearms and ammunition after January 6, 2021; and evidence of Jeremy Brown's explosives and firearms.    *See* 08/30/22 Tr.

    c.   ECF No. 386, Roberto Minuta's Motion *in Limine*, regarding witness narration of video and documentary evidence.    The government opposes both Minuta's and Hackett's motion below.

2.   *The Government's Proposed 404(b) Evidence Regarding Minuta is Admissible*

Minuta first argues that the government's proposed evidence pursuant to Federal Rule of Evidence 404(b), regarding Minuta's introduction and association with Rhodes in 2020, is improper.    The government disagrees and hereby incorporates its filing regarding this evidence filed in its notice on October 17, 2022.    ECF No. 374.

3.   *Factual Testimony Accompanying the Government's Summary Exhibits is Appropriate*

Minuta's final motion argues that the government should be precluded from presenting law enforcement witnesses to offer "testimony in the form of a narration of events depicted in any video footage or documents offered into evidence."    ECF No. 386 at 2.    The government does not intend to present "narration witnesses."    Instead, like in the first trial, law enforcement witnesses will testify to facts they are personally aware of from their investigation into the defendants and their actions, and they will identify in various exhibits individuals, times, locations, statements, and types of evidence that comprise various written and audio/video exhibits.    That is

proper testimony.   And it is especially helpful testimony for the jury when the evidence is comprised of multiple pieces of data, covers multiple months of events, involves hundreds of different individuals and communication threads, and displays chaotic scenes of a riot.   Notably, the Court has already ruled that this practice does not transform the agents into "summary witnesses" who both incorporate evidence and testimony as a pure summary, but rather they remain fact witnesses so long as they testify to their knowledge stemming from their investigation. *See* 10/26/22PM Tr. at 5511 ("I don't think there's been a classic summary witness here, somebody who both incorporates evidence and testimony as a pure summary.   That hasn't happened.").

4.   *The Government's Video Compilations Are Admissible Summary Exhibits*

Hackett argues that the government's video compilation exhibits are inadmissible, including government's exhibits 1500-1510, 1515-1516, and 1530.   *See* ECF No. 387 at 3-7. The Court has previously admitted all of these exhibits in the first trial.   In doing so, the Court has repeatedly rejected the same arguments Hackett makes now.

On October 17, 2022, for example, defense counsel for Kelly Meggs raised the same objection against government's exhibit 1501, regarding various co-conspirators' coordinated movement across the country from January 2 through January 5, 2021.   Counsel argued that the exhibit was a "demonstrative exhibit" and "not a summary exhibit in the sense that the witness has not taken a series of records and compiled them so as to ease the jury's review of those records. . . . [I]f we drill down on the source of the records and the various types of identifications that have been made, it's quite more than a summary exhibit.   It's really an animation."   Ultimately, the defense's concern was that, "[a]t some point now, we're just showing video to the jury of the government's case, and we're not relying on the underlying evidence."   10/17/22AM Tr. at 3576- 79.   The Court wholly rejected the argument:

4

> [The agent] took a disparate group of records and provided the information to lit support, which allowed them to map out the movements of the various individuals. . . . So this is, although it's dynamic, unlike a static summary exhibit, is a compilation of various sources of records that show movement of various individuals across the country.   So I'm sort of at a loss as to understand why that's not a summation of voluminous records that the jury can rely on.
>
> If you think there's any inaccuracies, you can cross-examine [the agent] about it and that's up to you.   But you've got the underlying records.   You have the opportunity to cross-examine her.   And it's a summary of voluminous records that show, as I said, movements across the country and where people stayed at various points, including when they arrived in the area on January the 5th. . . . This isn't some effort at, like, a reenactment.   This is simply just the plotting of data points along the map.   It's nothing more than that.   It's obviously a little more sophisticated, given the number of data points.   But it's not as if it's a reenactment of anything.

*Id*.   The next day, the Court ruled against Kelly Meggs and admitted government's exhibit 1501 as a proper summary exhibit after distinguishing it from the "animation of an alleged homicide" at issue in Meggs's cited case law, *Morency v. Annucci*, No. 14-CV-672, 2017 WL 4417718, at *8 (E.D.N.Y. Mar. 20, 2017).   *Id*. at 3580.

In fact, the Court has addressed Hackett's argument multiple times.   On October 19, 2022, defense counsel for Kelly Meggs raised the same objection—this time against government's exhibit 1500, regarding the co-conspirators' coordinated movements and actions on January 6, 2021: "This is an objection we made before that this is an animation and not a summary exhibit and, therefore, ought to be demonstrative and not given to the jury for deliberations." 10/19/22AM Tr. at 4183.   The Court again disagreed: "[W]hile it has some moving parts to it, the moving parts, as I understand it, are associated with underlying evidence.   This is not a demonstrative of a reenactment, for example, or an expected reenactment of some events, or a depiction, I should say, not reenactment, and this is really, it's a visual way of compiling disparate evidence into a more digestible form for the jury."   *Id*. at 4183-84.   The Court reemphasized that

the exhibits constitute appropriate summary exhibits, holding that what the defense "described as animation, really is a compilation of voluminous records . . . You're talking about disparate records being pulled together, time, place, you know, credit card records, phone records, et cetera." *Id.* at 4202.

The law supports the Court's ruling. Federal Rule of Evidence 1006 allows the use of a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." "The voluminous underlying records must themselves be admissible and 'must be made reasonably available for inspection and copying.'" *United States v. Abou-Khatwa*, 40 F.4th 666, 684-85 (D.C. Cir. 2022) (quoting *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014). "As long as the summaries of those voluminous records are accurate and nonprejudicial, the summaries can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses or documents throughout the trial." *Id.* (citing *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983)) (cleaned up). Under Rule 1006, these exhibits are substantive evidence and need no limiting instruction. *See id.* at 688 (citing *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008); *United States v. Weaver*, 281 F.3d 228, 233 (D.C. Cir. 2002); 2 MCCORMICK ON EVIDENCE § 241 (8th ed. 2020) ("Federal Rule 1006 is clear that summaries admitted under its terms are evidence themselves, substituting for the voluminous documents that are not admitted into evidence. And because such summaries are substantive evidence, no limiting instruction is given to the jury as to its use and it may be taken into the jury room during deliberations.")). *Id.*

The government's video and audio compilations constitute appropriate summary exhibits. As the Court has ruled, they are "a visual way of compiling disparate evidence into a more

digestible form for the jury."   That disparate evidence is comprised of voluminous records from a variety of sources, including: videos from public sources and legal process; surveillance video from the Capitol building and grounds; audio recordings from open sources and legal process; photographs from open sources and legal process; location information from open sources and legal process; call detail records from legal process served on numerous telephone providers; GoToMeeting records from legal process; and various maps.   The defense has these underlying records in discovery and will have the opportunity to cross-examine any witness whom the government calls to introduce the summary exhibits at issue.   Contrary to Hackett's argument, these summary exhibits will help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses or documents throughout the trial.   *See Abou-Khatwa*, 40 F.4th at 684-85.

5. *Co-Conspirator Statements before December 19, 2021, Are Admissible Against Hackett and Others and No Limiting Instruction is Necessary*

Hackett additionally argues that certain co-conspirator statements are inadmissible against him under Federal Rule of Evidence 801(d)(2)(E).   None of his arguments has merit.

As an initial matter, Hackett relies on outdated case law.   He asserts that statements by co-conspirators may be admissible if the Court concludes there is "substantial evidence, *independent of those statements*, that (1) a conspiracy existed, (2) the co-conspirator and the defendant against whom the statement is offered, were members of the conspiracy, and (3) the statements were made in furtherance of the conspiracy."   ECF No. 387 at 7 (citing *United States v. Gantt*, 617 F.2d 831, 844 (D.C. Cir. 1980)).   The Court, however, is not so limited.   After the Supreme Court's later decision in *Bourjaily v. United States*, 483 U.S. 171, 181 (1987), it is clear "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements

sought to be admitted." *See also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").    During the first trial, the Court reached the same conclusion on multiple occasions: "[T]he Supreme Court in [*Bourjaily*] not only looks at the statements but also notes that one of the statements involved [future conduct]" (10/04/22AM Tr. at 1424), and "Well, let's put it this way.   If what you're asking me is your original objection that the admissibility of this evidence turns on hearsay, prevents it from being admitted, I'm inclined to overrule that objection, because I do—I think I can rely on—well, I can rely on hearsay. . . . Take a look at Rule 104(a)" (10/12/22AM Tr. at 2659-60).

Factually, Hackett argues that statements by other co-conspirators before December 19, 2020, should be inadmissible against him, because the evidence neither establishes a conspiracy nor demonstrates Hackett's involvement that early.   ECF No. 387 at 8.   Should the Court disagree, Hackett submits, the Court should impose a limiting instruction that statements before December 19, 2021, cannot be used against a defendant as to Counts Two and Four, related to events in Washington, D.C. on January 6, 2021.   *Id*. at 8-9.   Neither argument is correct.   The conspiracy began in November 2020 and extended through January 2021, making pre-December 19 evidence relevant and admissible.   In fact, the Court has previously ruled as much in admitting certain November 2020 co-conspirator messages.   *See, e.g.*, 10/03/22PM Tr. at 1355-56 ("[T]he Government, through its proffers, you know, they've established a *prima facie* case of a conspiracy.   I don't think there's any doubt about that.   That's part of—these folks are part of the same organization.   They acted in concert, at a minimum, on January the 6th.   They're in communications with each other in advance of January the 6th.   So there's no doubt that the *prima*

*facie* case has been met here."); 10/04/22AM Tr. at 1425 ("[T]he conduct and the acts of January 6th, at least reasonably in some sense match up with the communication from the Serbian instructions [discussed amongst co-conspirators in November 2020].").

And the evidence supports the Court's rulings. The government has proffered and presented at the first trial sufficient evidence to establish by a preponderance of the evidence that in the days and weeks following the 2020 U.S. Presidential Election, the co-conspirators entered into an agreement to stop the lawful transfer of presidential power by any means necessary, up to and including the use of force. As early as November 9, 2020, for example, Rhodes outlined to other co-conspirators—including Kelly Meggs and Hackett—an objective to stop the lawful transfer of presidential power, including by preparing for the use of force, and urged those listening to participate. As legal challenges to the election sputtered, the co-conspirators explicitly discussed on various encrypted messaging platforms, including Signal and GoToMeeting, the need to act themselves to stop the transfer of power, and they began to focus on January 6 as a day of action for their objective. Then, on January 6, the co-conspirators seized the opportunity to advance their conspiratorial goal by participating in the attack on the Capitol, delaying the certification of the Electoral College vote, and preventing Members of Congress from discharging their duties. The co-conspirators' actions and statements throughout November and December 2020 are relevant and admissible to their criminal agreement to oppose the transfer of power by force. And, as the Court ruled in the first trial, once evidence is admitted, it is admitted—no limiting instruction tying evidence to particular counts or conspiracies is appropriate.

Relatedly, Hackett argues that any messages between Rhodes and others, such as co-conspirator Kellye SoRelle, are not in furtherance of the conspiracy, rendering them inadmissible. ECF No. 387 at 9. Hackett applies a narrower view of "in furtherance" than the law requires.

Again, the Court has ruled on this issue.   In deciding whether certain Rhodes statements were admissible, the Court noted:

> I ultimately fell back on . . . the Circuit's definition . . . of 'in furtherance of,' and this dates back to *United States v. Tarantino*, 846 F.2d 1384.   This is back from 1988.   It's the same definition the Circuit continues to use. . . . [If] the statement . . . can be reasonably interpreted,' the Court said, 'as encouraging a co-conspirator or another person to advance the conspiracy or as enhancing a co-conspirators or another person's usefulness to the conspiracy, then the statement is in furtherance of the conspiracy and may be admitted.

10/04/22AM Tr. at 1425-26.   Indeed, statements are in furtherance of a conspiracy if they "keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members."   *United States v. Miller*, 738 F.3d 361, 374 (D.C. Cir. 2013) (citing *United States v. Carson*, 455 F.3d 336, 367 (D.C. Cir. 2006)).

In a number of messages, co-conspirators Rhodes and SoRelle discuss criminal plans related to the charged conspiratorial objective, including when to take matters into their own hands. *See, e.g.*, December 10, 2020 Rhodes message, Gov. Exh. 6748 (Msg. 1.T.2186.50) ("[E]ither Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection (rebellion) Against the ChiCom puppet Biden. Take your pick."); December 29, 2020 Rhodes message, Gov. Exh. 6749 (Msg. 1.S.737.2820) ("And then I'll turn my attention to what I need to do as the founder and leader of Oath Keepers to prepare for what comes after Trump fails to do his duty. I'll also have a small contingency plan for what to do if he suddenly grows a pair. But most of my focus will be on presuming he won't. And preparing for the worst. . . . This will be DC rally number three. Getting kinda old. They don't give a shit how many show up and wave a sign, pray, or yell. They won't fear us till we come with rifles in hand. Only reason to go is so Trump knows we support him in taking Reg gloves off and kickin ass.

That's why I'm going. It's to send HIM a message. Not Congress. I'm done talking to them.").

Contrary to Hackett's argument otherwise, these messages to Rhodes's "inner circle" did not differ

from his messages to Hackett and others on the OKFL Hangout Signal chat.   In fact, On December

25, 2020, around the same time as his messages to SoRelle, Rhodes messaged Hackett and others:

> Trump needs to know we support him in using the Insurrection Act. And that needs
> to be the message – If Congress rubber stamps an unconstitutional fraud, President
> Trump must defend the Constitution and we URGE him to use the Insurrection Act
> to do so. And we will support him with our boots on the ground nationwide and we
> will protect him, and assist him. He needs to know that to his bones. We need to
> make it clear. And we need to have that message echoing off every roof top from
> now till that day. Focus like a laser on it. And he needs to know that if he fails to
> act, then we will. He needs to understand that we will have no choice.

Gov. Exh. 6860 (Msg. 1.S.656.10101-02).   As in the first trial, Rhodes's statements to SoRelle

and others are admissible against co-conspirators not in the conversation, including Hackett, as

statements in furtherance of the charged conspiracies under Rule 801(d)(2)(E).

Likewise, SoRelle's statements on January 6, 2021, are admissible against other co-

conspirators.   At approximately 1:31PM, after individuals began breaching the Capitol grounds,

SoRelle messaged other co-conspirators on the OLD Leadership CHAT, "We are acting like the

founding fathers—can't stand down.   Per Stewart and I concur."   Gov. Exh. 6731.   After

approximately 2:00 PM, SoRelle breached the restricted areas of the Capitol grounds with Rhodes.

SoRelle livestreamed herself on Facebook with Rhodes and the Capitol building in the

background, stating:

> I want to show y'all something, probably one of the coolest damn things I've seen
> in my entire life: I'm telling you right now, government, people are pissed, but you
> guys need to watch.  They broke the line, guys.  People are going.  This isn't a
> bad thing, and you can't be scared.  This is what you do.  Otherwise you end up
> as Communist little peasants, in little societies where you have no ability, no voice,
> no vote—you're basically slaves.  But this is what happens when the people are
> pissed—they rise up.  So you know what, guys?  It's pretty amazing.  You guys
> should enjoy it.  They broke the barrier, they got up there, they may end up inside

before it's all said and done, and that's okay, too. That's how you take your
government back. You literally take it back.

In another video, SoRelle stated, "Just so you can see, they had barricades up – keeping us away

from the building was the goal. . . . Over the top, they've occupied both sides now, oh no, think

we can hang 'til the 20th or what?" Approximately 40 minutes later, Hackett and others breach

the Capitol building. SoRelle's order to other co-conspirators to act like the founding fathers and

not stand down, followed by her public encouragement to others to join, not be scared, and remain

until the Inauguration, all constitute statements in furtherance of the conspiracy that are admissible

against the other co-conspirators including Hackett.

6. *Firearm Evidence is Admissible*

Next, Hackett argues that the government should be precluded from introducing evidence

of firearms unless there is evidence that the firearm was transported to the Washington, D.C., area.

Firearms and, by default, access to firearms are a key tenet of the charged conspiracies. The co-

conspirators are alleged to have organized an armed QRF in Virginia, in part, to be prepared to

support their criminal objective of stopping the transfer of power by force. Throughout

November, December, and January, the co-conspirators discussed firearms, arranged QRFs, and

stocked those QRFs with firearms and ammunition—all in support of their criminal objective.

*See* November 9, 2020 Rhodes Message on GoToMeeting, Gov. Exh. 1000.7 (Rhodes stated his

intent to organize an "armed QRF" or "quick reaction force" outside the city to support operations

inside.); December 30, 2020 Caldwell message to Watkins ("[Paul Stamey] is committed to being

the quick reaction force and bringing the tools if something goes to hell. That way the boys don't

have to try to schlep weps on the bus."); January 2, 2021 messages between Rhodes and Kelly

Meggs (Rhodes: "Ok. We WILL have a QRF. this situation calls for it." Gov. Exh. 6923 (Msg.

1.S.613.175).   Meggs: "Yes we have the overlay maps of street closures and it looks like Lincoln is our RP of SHTF. Lots of access roads on the edge of main area." *Id.* (Msg. 1.S.613.176). Rhodes: "That's good. Both in and out is very useful." *Id.* (Msg. 1.S.613.177)).

Florida Oath Keeper and co-conspirator Jason Dolan testified in the first trial about his understanding of the purpose of the QRF, based on what he had heard from Rhodes, Meggs, and others on the OKFL Hangout Signal chat:

> [W]e would have our firearms in—in Virginia. The overall goal why is if the Insurrection Act was declared, we would have a QRF, quick reaction force, ready to go get our firearms in order to stop the election from being certified within Congress. . . . And if [President Trump] didn't do it, then we would need to step up and stop the certification of what—what I saw—I don't want to put words in his mouth, but as what I saw as an illegitimate election. So the certification process would still have to be stopped.

10/18/22PM Tr. at 4109-10.   Dolan explained that it was Rhodes's messages like, "If [Trump] doesn't do his duty, we will do ours," that were "why we brought our firearms." *Id.*   When the co-conspirators arrived in the D.C. area on January 5, 2021, the defendants and their co-conspirators dropped off firearms, ammunition, and tactical equipment with members of the QRF at the hotel in northern Virginia. 10/17/22AM Tr. at 3521-29.

Whether a defendant discussed firearms and ammunition, trained with them, had access to them, purchased them, transported them, or used them is relevant to the co-conspirators' state of mind and actions in furtherance of the conspiracy throughout the months-long charged timeline. Limiting the firearms evidence to only those items that co-conspirators brought to the QRF hotel on one day in the charged timeline would inappropriately curtail the government's evidence.[2]

---

[2] As noted above, *supra* at 2-3, the government incorporates its arguments in opposition to Caldwell's motion on August 12, 2022, which directly address why other related firearms evidence, including Rhodes's various purchases before and after January 6, 2021, are admissible. ECF No. 251.

7. *Miscellaneous Issues Raised by Hackett*

Finally, Hackett raises a number of miscellaneous arguments that should all be denied. ECF No. 387 at 11-12.

First, he argues the government should be precluded from using statements such as "general looking over a battlefield" and references to John Wilkes Booths yelling "sic semper tyrannis" during its opening statement. While "the government must take care to ensure that statements made in opening and closing arguments to the jury are supported by evidence introduced at trial," *United States v. Opio Moore*, 104 F.3d 377, 390 (D.C. Cir. 1997), the government "is not required to make its opening argument in a rote manner," *United States v. Rodney Moore*, 651 F.3d 30, 52 (D.C. Cir. 2011). *See Opio Moore*, 104 F.3d at 390 (holding that the government's reference to the defendants in opening as "two armed gunman driving through the streets of D.C., armed to the teeth, dressed for action, carrying a load of dope" was not improper, because it was supported by the evidence). As in *Opion Moore*, both of the statements Hackett highlights from the first trial were ultimately supported by the evidence presented at trial. The co-conspirators' admitted statements were replete with references to "civil war," "war," "bloody civil war/revolution," "armed conflict," and "guerilla warfare." And at least one witness testified that John Wilkes Boothe yelled "sic semper tyrranis" when he assassinated the head of the federal government. 10/20/22PM Tr. at 4724. The co-conspirators in this trial discussed battle, dressed for battle, and attacked the Capitol—the government intends to open on those facts supported by the evidence.

Second, Hackett moves to preclude any government witness from testifying that the House of Representatives' Emergency Recess Provision was enacted in response to the terrorist attack on September 11, 2001. On October 19, 2022, Mr. Thomas Wickham, the former House

14

Parliamentarian, testified that the House of Representatives went into recess at 2:18PM after an elected official declared a recess pursuant to Clause 12(b) of Rule 1.   10/19/22PM at 4442.   Mr. Wickham explained that he was in the office when the provision was written and that it was meant for emergencies.   His testimony about the origin of that provision, and its use in emergencies, is relevant to explain to the jury how those inside the Capitol were reacting to the ongoing riot on January 6, 2021.

Third, Hackett moves to sequester all law enforcement officers who will testify as government witnesses aside from the lead case agent.   Federal Rule of Evidence 615(b) specifically allows a case agent who may testify to remain in the courtroom throughout the trial. This exception to the general rule against a witness being present at trial applies to investigative agents, such as federal agents and police detectives.   *See* Fed. R. Evid. 615 Advisory Committee note to 1974 Enactment ("Many district courts permit government counsel to have an investigative agent at counsel table . . . although the agent is or may be a witness.   The practice is permitted as an exception to the rule of exclusion and compares with the situation defense counsel finds himself in—he always has the client with him to consult during trial").   In *United States v. Sullivan*, the D.C. Circuit recognized that "under the second exception to Rule 615," the government is permitted "to designate a law enforcement officer to remain in the courtroom as the government's representative."   56 F.3d 1532, 1995 WL 364662, at *2 (D.C. Cir. 1995) (unpublished); *see also United States v. Wilkins*, 538 F. Supp. 3d 49, 68 (D.D.C. 2021) (granting government motion to allow the testifying case agent to remain at counsel table throughout trial because it was "consistent with the governing Rules of Evidence"); *United States v. Gonzalez*, 20-CR-40 (BAH), 2020 WL 6158246, at *6 (D.D.C. Oct. 21, 2020) ("Federal Rule of Evidence 615(b) plainly allows the government to exempt from sequestration an investigative agent who may also be called as a

witness").

Given the nature of the case, the number of defendants and subjects, and the number of case agents who handled different aspects of the investigation throughout the country, during the trial the government intends to have multiple law enforcement agents in the courtroom acting as "case agents" pursuant to Rule 615(b). *United States v. Phibbs*, 999 F.2d 1053, 1072 (6th Cir. 1993) ("[C]ertain prosecutions may be complex enough that the aid of more than one law enforcement officer is needed to sort through extensive, technical evidence, and to help 'map out strategy.' When the government wants to have two agent-witnesses in attendance throughout a trial, 'it is always free to designate one agent as its representative under subpart (2) [to Rule 615] and to try to show under subpart (3) that the presence of the second agent is 'essential' to the presentation of its case.'") (cleaned up). Indeed, the Rule allows, in the Court's discretion, the designation of more than one "case agent" to remain in the courtroom. *See, e.g.*, *United States v. Edwards*, 34 F.4th 570, 585 (7th Cir. 2022); *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981). And Rule 615 plainly allows the government to later call as a witness a case agent who was present in the courtroom during other witnesses' testimony. *Gonzalez*, 2020 WL 6158246, at *6.

Fourth, and relatedly, Hackett argues that the government should be precluded from calling certain witnesses multiple times at trial. As detailed above and in other filings, the nature of the government's investigation, the complexity and volume of evidence, and the breadth of the conspiracy all warrant allowing government to call certain agents multiple times to break the presentation of the evidence down for the jury. Hackett does not provide legal authority in support of his position, and equitable principles of reducing jury confusion and streamlining the presentation of evidence support the government's.

16

Finally, Hackett requests the opportunity for re-cross. Generally, Federal Rule of Evidence 611 grants the Court broad authority to control the "mode and order of examining witnesses and presenting evidence." Specifically, "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611. In light of the amount of evidence, number of witnesses, and volume of data in this case, the government agrees with the Court's decision in the first trial to not allow re-cross as a general, default rule for the trial.

WHEREFORE, the government respectfully requests the Court deny the defendants' motions *in limine*.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By: _____
Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar No. 5453741
Louis Manzo
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office, District of Columbia
601 D Street NW
Washington, D.C. 20530

_____/s/_____
Alexandra Hughes
Trial Attorney
National Security Division
950 Pennsylvania Avenue NW
Washington, D.C. 20004

17